BENT, Respondent, vs. JONET, Receiver, Appellant.

*December 6, 1933—January 9, 1934.*

For the appellant there was a brief by *Clifford & Dilweg* of Green Bay, and oral argument by *G. F. Clifford*.

For the respondent there was a brief by *Silverwood & Fontaine* of Green Bay, and oral argument by *T. P. Silverwood*.

WICKHEM, J.  The defendant is a Wisconsin corporation engaged in the promotion of professional football.  On the date in question defendant engaged its own and another team in an exhibition at a local public park, and the general public was invited to enter the inclosure upon payment of a cash admission fee.  Plaintiff paid one dollar admission fee, which entitled him to occupy a bleacher seat.  The bleachers were constructed of wooden boards, supported by risers also of boards.  The seats and foot-rests rose in tiers at an angle, the top seat being variously estimated at from seven to eleven feet from the ground.  In each section there were a series of three stringers, which are connected by two-by-fours with strap iron on the ends.  There is a bracket placed on the riser, which contains a slot at the top with lugs projecting on each end about an inch, approximately from seven-eighths to an inch high.  The boards, ten and one-half inches wide and sixteen feet long, are placed in each bracket, there being eight of these on each riser or stringer, the boards of each section overlapping.  The stringers are held in place by bucks into which they fit and cross braces so as to make the entire structure solid.  There is no contention in this case that the bleachers were not capable of bearing the weight they were designed to carry, or that they were not sufficiently solid in construction.  The top seat of these bleachers was constructed like the rest, with the exception that it had no riser

or stringer at the back to prevent the seat being displaced and the boards were not fastened. There was no guard rail erected to protect the occupants of the top seat from falling off.

The plaintiff purchased a bleacher seat on September 20, 1931, and walked over to the side of the field where this bleacher was located. He was on the seat approximately a half hour before the game started. During the game all of the people in front of him stood up and plaintiff also stood up. He claims that without looking he then went to sit down and that the plank was not there. By some means the plank had been pushed off. He fell off the foot-board a distance of five to seven feet, and received the injuries in question.

The first and principal contention of the defendant is that the bleacher is not a public building and that sec. 101.06, Stats., generally referred to as the safe-place statute, has no application. Upon the validity of this contention depend at least three other contentions of the defendant, to wit, that the court erred in instructing the jury as to the duty of the defendant; that the bleacher seat is at most a mere appliance; and that the rule with reference to charitable organizations applies to this situation and determines that there is no liability of the defendant.

With reference to the principal issue, it is contended that the bleacher, which was a temporary affair, fastened to the ground by stakes and capable of being easily dismantled for the purpose of moving it to other locations, has not the character of permanency which the word "building" denotes. It is further contended that it is not an inclosure; that it has no walls, no covering, and no permanent base. This court, in *La Crosse & Milwaukee R. Co. v. Vanderpool,* 11 Wis. *119, said:

"But notwithstanding this, we think the word 'building,' as a noun, has a common, well understood meaning, exclu-

sive of structures of this character, and including only those which have a capacity to contain, and are designed for the habitation of man or animals, or the sheltering of property."

The court, in the *La Crosse Case,* held that a railroad bridge was not a building subject to mechanic's lien. There can be little doubt that defendant's position is entirely correct, if we are merely dealing with the scope of the word "building" as it is ordinarily used in contracts and perhaps even in statutes. We are not so concerned, however. Sub. (12) of sec. 101.01 contains a definition of the term "public building" which is binding for the purposes of the safe-place statute. This section provides:

"The term 'public building' as used in sections 101.01 to 101.29 shall mean and include any structure used in whole or in part as a place of resort, assemblage, lodging, trade, traffic, occupancy, or use by the public, or by three or more tenants."

The words of the statute are very broad. A building is any structure used for the purposes enumerated in the statute. That this is a structure is hardly open to doubt. There is no provision in the statute indicating that a structure must be an inclosure, with walls and roof, nor does the policy of the statute call for such a restricted meaning, nor do the terms of the statute support the contention that the temporary character of the structure is material. The objective of the statute is to insure safety by the broadest sort of provisions with respect to the kind of places affected. The person resorting to a public place is quite as apt, if not more so, to be injured by the collapse or improper design of a temporary structure as that of a permanent one. No reason is perceived why there should be a distinction between these types of structures. The cases of *Holcomb v. Szymczyk,* 186 Wis. 99, 202 N. W. 188, and *Juul v. School District,* 168 Wis. 111, 169 N. W. 309, are cited to the proposition that the safe-place statute relates to a permanent building.

This is not the doctrine of these cases. They merely hold that a building is safe when it is composed of proper materials and so designed as to be structurally safe, and that the statute is not applicable to temporary conditions, such as accumulation of ice and snow, having nothing to do with the design or materials of the building. However, in this case the difficulty was one of design or construction, in that the bleachers were so planned and made as not to give proper lateral support to the board upon which plaintiff was sitting, as a result of which the board was pushed out and dropped down.

It is our conclusion that the bleacher must be held to be a public building within the meaning of this section. This being true, the court's instruction to the effect that defendant's duties were measured by the safe-place statute was correct.

The conclusion as to the character of the structure also disposes of the next contentions of defendant,—that the bleacher was a mere appliance and not a public building, and that the court improperly refused to apply to defendant the rules applicable to the tort liability of charitable institutions. It was held in *Wilson v. Evangelical Lutheran Church*, 202 Wis. 111, 230 N. W. 708, that the safe-place statute applies as fully to religious and charitable institutions as it does to any other; hence the validity of this instruction depends upon the conclusion as to the character of this bleacher as a public building.

It is next contended that the court should have submitted to the jury the question of assumption of risk on the part of the plaintiff. The basis for this is that there was a known and obvious condition apparent to any one upon use; that the plaintiff deliberately bought a bleacher seat, paying a smaller entrance fee on this account than if he had purchased a seat in the permanent stands; that plaintiff was a contractee. It is further contended that plaintiff was not

occupying this seat as a member of the public; that it was not like the use of the common aisles or common toilets, which were available to all who were admitted to the game; that he had a right to occupy this seat and to exclude any one from it. Once it is established that this is a public building and that plaintiff occupied a seat as a member of the general public, the doctrine of assumption of risk has no application. *Washburn v. Skogg,* 204 Wis. 29, 233 N. W. 764, 235 N. W. 437; *Kelenic v. Berndt,* 185 Wis. 240, 201 N. W. 250. To conclude that because plaintiff had a right to occupy this very seat, to the exclusion of others, he did not occupy it as a member of the public, would be to place a restriction upon the operation of the safe-place statute not intended by the legislature. The statute was designed to protect persons who resort to public buildings, not merely while they are in the aisles, or toilets, or corridors, but when they are in their seats. A public building to which admission is charged is open to the public upon payment of the fee, and the fact that for ordinary purposes and the orderly handling of the crowd, individual seats are contracted for or assigned, does not affect the operation of the statute. Neither does the fact that the plaintiff has contracted with the corporation for admission to the grounds have any effect. That is simply the source of his authority to enter the public place, and it cannot have been intended that he was without the protection of the statute because he had paid an admission fee.

It is contended that the verdict is perverse with respect to damages. Plaintiff's loss of wages was assessed at $4,575, and his pain and suffering at $200. It is claimed that there is such a great disparity between these two items as to indicate a perverse verdict. The plaintiff had a most unusual record of accidents and physical impairments. Since 1916 he had suffered, in order, a fractured shoulder, a broken wrist, a fractured breast bone, a fractured rib, a fractured

elbow, and finally in this accident a fracture of the second lumbar vertebra. He was intemperate in his habits, by his own admission, and had been hospitalized for treatment for this. He suffered from angina pectoris; also osteo-arthritis, which it is claimed caused a stiff back, and an advanced stage of syphilis. Defendant's medical testimony was to the effect that the fracture and resulting injury play a negligible role in plaintiff's present condition, and that he had entirely recovered from the effects of the fracture, and any disability that he had was the result of other ailments heretofore referred to. It is in evidence, however, that in spite of this very impressive group of injuries and maladies, plaintiff had worked steadily for upwards of fifteen years and was earning $25 per week up to the night before the accident; that he was injured in September, 1931; that the trial occurred in February, 1933, and that he had been wholly incapacitated from work except for a period of two months, after which he had to cease work entirely. Plaintiff's medical testimony was that his condition is due to the fracture and crushing of the vertebræ; that in some occupations he would have one hundred per cent. disability; that in others he would have fifty per cent. disability; that the injury is permanent, and that nature has repaired the injury in so far as it ever can be repaired. There is evidence that from the date of the accident to the date of the trial the wage loss of the plaintiff amounted to $1,850. There would seem to be little doubt that plaintiff sustained a very severe injury as a result of his fall from the bleacher, and one that was quite likely to result in a permanent disability. In spite of his former injuries he had worked steadily up to the time of the accident. It was open to the jury to conclude that he has been unable to work since this accident. His age was fifty-two, and considering his expectancy of life, together with the medical testimony offered in his behalf, we cannot

say that the amount of damages assessed is excessive or that the disparity between wage loss and damages for pain and suffering indicates a perverse verdict.

While assumption of risk is not a defense, contributory negligence has always been a defense in actions under the safe-place statute, the defendant's liability constituting a type of statutory negligence. *Beck v. Siemers,* 174 Wis. 437, 183 N. W. 157; *Du Rocher v. Teutonia M. C. Co.* 188 Wis. 208, 205 N. W. 921; *Langos v. Menasha P. Co.* 156 Wis. 418, 145 N. W. 1081. This defense was changed by ch. 242, Laws of 1931, from a complete bar to a partial defense in all cases where the plaintiff's negligence is less than that of the defendant.

The jury found the corporation to be ninety per cent. negligent and the plaintiff ten per cent. It is claimed that the verdict of the jury with respect to comparative negligence is against the great weight and clear preponderance of the evidence. This court has held, both in *McGuiggan v. Hiller Brothers,* 209 Wis. 402, 245 N. W. 97, and *Brown v. Haertel,* 210 Wis. 345, 244 N. W. 630, that only in rare instances could this court reverse a jury's finding with respect to the comparative negligence of plaintiff and defendant, and then only in cases where the negligence of each was of the same kind or character. The evidence on behalf of the defendant was that this was a bleacher in general use all over the state; that there was no building code provision for a guard rail on the top board, and that the bleacher was a standard appliance built according to usual specifications; that it was thoroughly inspected both by the building inspector and an alderman of the city of Green Bay, and by the chief usher; that at the time when plaintiff used this particular plank it was in its proper position; that the bleacher was of the latest and most approved type of bleachers in common use. It is contended that the obligation of the defendant,

here imposed, is to do something that no other person ever did, or ever thought of as necessary, and that in view of this the negligence involved must be relatively small.

With respect to the negligence of the plaintiff, he testified that he could see that the boards were not fastened; that he could see this when he walked up to the top of the bleacher, and that there was some give in the boards because they were loose; that he did not look before he sat down, to ascertain whether the plank was fastened; that he knew that if it wasn't fastened it would not be safe to sit down; that if he looked he would not have sat down. He was asked whether there was anything on the planks that prevented him from seeing whether they were fastened, and he stated that he paid no attention. Detailed questions as to what he saw with reference to the support and manner of construction were met with the same answer—"I paid no attention." It is claimed on the authority of *Brown v. Haertel,* 210 Wis. 345, 244 N. W. 630, that this court has the power to determine as a matter of law that plaintiff's negligence is greater than defendant's. The power may be conceded, but this is a case in which the comments heretofore made in the *Brown* and *McGuiggan Cases* are applicable. The negligence of plaintiff and defendant is entirely different in character, and this court cannot, as a matter of law, say that one was greater than the other. The question was for the jury.

It is claimed that the court erred in excluding expert testimony offered by the defendant that this bleacher complied with the building code and rules of the Industrial Commission. The case of *Allison v. Wm. Doerflinger Co.* 208 Wis. 206, 242 N. W. 558, is cited in support of the rule that expert testimony would be receivable if the matter related to skill or science, even though the ultimate question before the jury was passed upon. Had orders of the Industrial Commission been in evidence, specifying the design and construction of these bleachers, expert testimony might have

been admissible to explain them, and opinions of experts as to the conformance by the bleachers to the rules and orders of the commission might have been admissible under the doctrine of the *Doerflinger Case*. In such a situation the issue would be quite different. Under sec. 101.09 the Industrial Commission has the power to make and enforce lawful orders for the purpose of securing the safety of employees and frequenters of public buildings. When the commission does make a lawful order, and it is complied with, the safety of the place involved is conclusively established, at least in so far as the subject matter of the order is concerned. Thus when an order of the commission is claimed to be applicable, the sole question is whether the structure conforms to the order. If it does, the jury may not substitute its conclusions as to its safety for those of the body vested by statute with the power to determine this matter. Where there is no proper evidence of an order by the commission applicable to the situation, the jury must be left to determine the issue, and unless the matter is one involving skill and science, opinion evidence is not admissible. The evidence offered was an attempt to prove compliance with the rules and code by use of experts, without offering primary evidence of rules or code. It did not purport to be expert opinion that the bleacher was as safe as its nature would reasonably permit. It was properly rejected.

*By the Court.*—Judgment affirmed.